UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

TRACY SOLOMON,

                    Plaintiff,              06 Civ. 2375

        -against-                           OPINION

METROPOLITAN LIFE INSURANCE
COMPANY and OXFORD HEALTH
INSURANCE CO.,

                    Defendants.

----------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        KOOB & MAGOOLAGHAN
        221 Devoe Avenue
        Yonkers, New York  10705
        By:  Elizabeth L. Koob, Esq.

        Attorneys for Defendants

        LESTER SCHWAB KATZ & DWYER, LLP
        120 Broadway
        New York, New York  10271-0071
        By:  Allan M. Marcus, Esq.



**Sweet, D.J.**

Defendants Metropolitan Life Insurance Company

("MetLife") and Oxford Health Plans, Inc. ("Oxford")

(collectively, the "Defendants") have moved under Rule 56,

Fed. R. Civ. P., for summary judgment dismissing the

complaint of plaintiff Tracy Solomon ("Solomon" or the

"Plaintiff") and granting their cross counterclaim seeking

recovery of benefits paid. Solomon has cross-moved under

the same rule for summary judgment granting her the relief

she has sought under the Oxford Employee Welfare Plan (the

"Plan") and dismissing Defendants' counterclaim. Upon the

findings and conclusions set forth below, Defendants'

motion is denied, and the cross motion of Solomon for

summary judgment on her claim is granted.

## I. Prior Proceedings

Solomon filed her complaint on March 27, 2006,

seeking to compel MetLife to grant her benefits under the

Plan.

Defendants filed their motion for summary

judgment on March 18, 2008. Plaintiff's cross motion was

1

filed on July 14, 2008.  The motion and cross motion were
marked fully submitted on August 20, 2008.

## II.   The Facts

The facts have been set forth in the Defendants'
Local Rule 56.1 Statement, the Plaintiff's Response, the
Plaintiff's Local Rule 56.1 Statement, and the Defendants'
Response and are not in dispute except as noted below.

Oxford established and maintains an employee
welfare benefit plan governed by the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et
seq.  The Plan provides long-term disability ("LTD")
benefits to eligible employees.

MetLife is the Plan's claims administrator and
also funds Plan benefits through a group policy of
insurance.  As Plan administrator, MetLife has
"discretionary authority to interpret the Plan and
determine eligibility and entitlement to Plan benefits in
accordance with the terms of the Plan."  Affidavit of
Margaret A. Calderon ("Calderon Aff."), Exh. B, Summary
Plan Description ("SPD") at 44.

2

To be eligible for LTD benefits, a participant
must "require the regular care and attendance of a Doctor
and [be] unable to perform each of the material duties of
your regular job." Id., SPD at 21. After the first 24
months of LTD benefit payments, the definition of
disability changes to mean the inability to perform the
duties of "any gainful work or service for which you are
reasonably qualified taking into consideration your
training, education, experience and past earnings." Id.

Under the Plan, a participant-claimant must
provide documented proof of disability "satisfactory to
[MetLife]." Id., SPD at 33. As claims administrator,
MetLife is responsible for initially reviewing claims and
determining benefits eligibility. If a claim is denied,
the participant may appeal to MetLife, which will render a
final claim decision.

The Plan provides that monthly LTD benefits are
reduced by "Other Income Benefits," including Social
Security Disability Income ("SSDI") benefits. The Plan
also provides that any overpayment of LTD benefits due to
the retroactive receipt of Other Income Benefits shall be

3

refunded to MetLife. If a claimant signs an agreement to repay MetLife any such overpayment, MetLife will not reduce monthly LTD benefits by an estimate of SSDI benefits.

Solomon, a registered nurse, was employed by Oxford as a medical claim case manager, which is a sedentary job. Solomon worked at Oxford until March 16, 1999, when she claimed to be disabled due to back pain following a fall.

Effective September 8, 1999, MetLife approved Plaintiff's LTD benefits claim. MetLife received medical information from Solomon's treating orthopedic surgeon, Dr. L. Starace ("Dr. Starace"), who diagnosed Solomon with lumbar radiculopathy and fibromyalgia, and from her treating rheumatologist, Dr. H. Paul Laskey ("Dr. Laskey"), and physical therapist, Gene Pavone ("Pavone").

Solomon signed an agreement to repay MetLife any overpayment of LTD benefits generated by receipt of SSDI benefits. MetLife assigned a Social Security specialist to work with Solomon to obtain SSDI benefits who reported that Solomon was a feasible candidate for SSDI benefits due to her multiple conditions.

4

In July 2000, MetLife also arranged for
independent orthopedist Dr. Ralph Purcell ("Dr. Purcell")
to examine Solomon. In an independent medical examination
("IME") report dated August 1, 2000, Dr. Purcell found no
objective medical basis for any disability from an
orthopedic standpoint. On the basis of the IME, MetLife
terminated Solomon's benefits effective September 19, 2000,
and Solomon appealed.

MetLife then had the claim file reviewed by an
independent rheumatologist, Dr. J. Lieberman ("Dr.
Lieberman"), who opined that Solomon's fibromyalgia was not
disabling, but that more information should be obtained
regarding a neurological diagnosis. Following discussion
with Dr. S. Fromm ("Dr. Fromm"), Solomon's treating
neurosurgeon, Dr. Lieberman stated that Solomon's
neurological problems might be disabling and recommended a
reassessment in three months.

By letter of January 26, 2001, MetLife notified
Plaintiff that her LTD benefits were being reinstated.

Solomon then submitted a "Personal Profile" form

to MetLife dated October 11, 2002, along with a handwritten

addendum in which she set forth numerous restrictions on

her daily living activities and general limitations "for

varying amounts of time due to stiffness, pain and

dizziness." Affidavit of Margaret A. Calderon ("Calderon

Affidavit"), Exh. A, Claim File at 498-99. With respect to

driving, Solomon answered "Yes" to the question "Do you

drive?" explaining that:

> It is difficult to sit and focus and concentrate
> to drive and I also get dizzy and have the
> feeling of moving when not in motion. I do not
> drive unless it is to the convenient [store] one-
> quarter mile from my home. The doctors all have
> restricted driving.

Id., Claim File at 504. With respect to shopping, she

stated, "I cannot shop as I cannot stand or walk any

distance. I don't go unless I absolutely have to and then

it is to the corner store," and further that, among other

limitations, "I cannot sit or stand for longer than 5-15

minutes. I cannot lift anything over 3 or 4 pounds. I

can't bend, twist, or stretch for things." Id., Claim File

at 499, 504.

On November 12-14, 2002, Metlife conducted

surveillance of Solomon. A video and written report of the

6

surveillance were prepared. The surveillance report notes

that Solomon was able to drive to a medical appointment and

to the grocery store, was able to lift and carry grocery

bags, and was observed walking and bending with apparent

discomfort and distress. The MetLife referral form for

medical review characterizes the surveillance video in the

Brief Summary of Claim as, "Compelling video from 11/2002

demonstrating EE's high level of functioning." Id., Claim

File at 650.

According to Plaintiff, the surveillance video

shows her engaging in no activity on November 12, 2001, and

less than ten minutes of activity carrying bags of

groceries from her car approximately 20 steps to her first

floor apartment on November 13, 2001. The surveillance

report states that on November 14, 2001, Solomon drove her

car 7-9 minutes to and from a doctor's office with no

further activity observed for the day. According to

Solomon, a whitepage.com search for the doctors who are

reported to have offices in the building to which Solomon

traveled informs that the address was 3 College Rd.,

Monsey, New York, not Rockland, New York, as stated in the

report. Mapquest estimates that the drive from Solomon's

7

home to the doctors' building takes 5 minutes to travel the
2.22 mile distance.  This estimate is disputed by MetLife.

According to Solomon, there is no documentation
in the diary notes or elsewhere in the claim file
indicating that any claims administrator, reviewer, or
medical consultant actually viewed or even requested to
view the surveillance video.  MetLife took no action
against Solomon based upon the November 2002 surveillance
until more than a year later when it referenced the report
in the referral of the file to Dr. Amy Hopkins ("Dr.
Hopkins") on January 8, 2004.

In July 2003, MetLife received a Notice of
Disapproved Claim dated January 27, 2003, from the Social
Security Administration ("SSA").  The SSA denied Solomon's
claim for SSDI benefits, stating that it had "determined
that [Solomon's] condition is not severe enough to keep
[her] from working."  Id., Claim File at 447.  Solomon's
attorney notified MetLife of her request for a hearing on
the denial.

On August 27, September 25, and November 25,
2003, MetLife requested updated medical records from

8

Solomon. During the period from her application for LTD

benefits on March 10, 1999, to the December 1, 2003

termination of benefits, MetLife requested updated medical

information from Solomon or her doctors on 34 separate

occasions.

By letter dated November 25, 2003, MetLife

notified Solomon that, as no recent documentation had been

submitted to support her disability claim, benefits would

be terminated effective December 1, 2003. In December 2003

and January 2004, MetLife received various medical records

from Solomon and her treating physicians. Among these

were:

- (i) Office notes of Dr. Fichman, a rheumatologist, describing the treatment for Solomon's fibromyalgia. Dr. Fichman also described Solomon as "[n]eurologically . . . grossly intact." Id. Claim File at 411, 427.

- (ii) A March 20, 2003 report from Dr. Fromm describing his examination of Solomon. Dr. Fromm's diagnosis was peripheral polyneuropathy, with symptoms of decreased sensation in fingers and hands. He described Plaintiff's gait as normal and recommended MRIs of the spine and head to determine whether there were cerebral or spinal cord abnormalities. Dr. Fromm did not opine whether Solomon was unable to work. Id., Claim File at 420.

- (iii) October 10, 2003 MRI reports. The MRI of the brain was described as "normal." The cervical spine MRI revealed "mild degenerative disc disease at C4-6 with mild spondylosis and

9

> arthrosis . . . . There is no herniated disc or
> other epidural mass. There are no interdural
> masses. The spinal cord demonstrated normal
> signal intensity. The cranocervical junction is
> normal." Id., Claim File at 422—23.

A MetLife diary note dated December 31, 2003, reports that
Plaintiff was advised that all requested information was
received.

MetLife then referred Solomon's file to Dr.
Hopkins, Board-certified in internal and occupational
medicine, for review. The MetLife referral form requesting
a file review from Dr. Hopkins asks the following: "Based
on most current medical, does documentation support a
severely disabling medical condition that would render EE
totally disabled from any occupation?" Id., Claim File at
650. The second question on the form is "Does EE
[employee] have, at a minimum, a sedentary to light work
capacity?" Id.

Dr. Hopkins assessed each of Solomon's reported
diagnoses and conditions and concluded that none of them
was "objectively documented" to preclude Solomon from
returning to work as of November 30, 2003. Id., Claim File
at 404. In particular, Dr. Hopkins noted that Solomon's
gait and motion strength were found to be normal; that

10

there was no evidence of radiculopathy, myopathy,
plexopathy, disc herniation, spinal stenosis, cord
compression or nerve root compression; that the video
surveillance was inconsistent with Solomon's self-reported
symptoms; and that there was no medical information about
sleep disorders or a heart condition. MetLife sent Dr.
Hopkins' report to treating physicians Drs. Fromm and
Fichman for comments.

On January 14, 2004, Metlife again terminated
Solomon's LTD benefits, and notified her of her right to
appeal.

According to Solomon, on February 20, 2004, she
sent a fax to MetLife contesting the denial of her claim,
and included a neurosurgical narrative from Dr. Fromm
stating that her disabling condition was permanent, and
that the MetLife Appeal unit responded by letter dated
March 2, 2004, stating that she must follow the review
procedures to request a review of her claim denial.
Solomon, through her attorney, filed an appeal on April 5,
2004.

11

MetLife received additional medical information
from Solomon and her attorney including information from
Dr. Susan Levine ("Dr. Levine"), an infectious disease
specialist, who diagnosed Solomon with chronic fatigue
syndrome ("CFS") and who opined that Solomon remained
completely disabled from working.

Solomon's attorney, Aba Heiman ("Heiman") also
submitted letters dated June 29, 2004, and July 16, 2004,
enclosing medical reports and articles summarizing the
medical information supporting Solomon's claim.  Heiman
further submitted an SSA Notice of Decision dated July 28,
2004, awarding Solomon SSDI benefits.

MetLife sent the claim file to Dr. Joseph Jares
("Dr. Jares"), Board-certified in neurology, for evaluation
of Solomon's functional capacities, and to Dr. Elinor Mody,
Board-certified in rheumatology.  Both of the reviewing
doctors were retained through a corporation used by MetLife
to find medical reviewers, Network Medical Review Company,
Ltd. a/k/a Elite Physicians, Ltd. ("NMR" or "Elite").  In
the year 2004, NMR and Elite received $838,265 or 11.57% of
its gross income from arranging consultant reviews for

12

Metlife. Dr. Jares prepared 603 consultant reviews for NMR
in the year 2004, none of which involved examinations.

There is no referral form in the file for the two
doctors who were asked to review the file at the appeal
level. While neither doctor examined Plaintiff, both were
asked to fill out a form estimating her physical
capabilities based on their review.

In Dr. Jares' report dated September 3, 2004, he
opined that, from a neurological standpoint, Solomon
retained the functional capacity to work full time in a
sedentary occupation. He stated:

> She has been repeatedly described as having
> intact neurological function with no evidence of
> weakness, atrophy, reflex loss or incontinence.
> Her MRI and EMG findings do not point to a
> process so severe that Ms. Solomon could not work
> in a sedentary position.

Id., Claim File at 138. Dr. Jares further reported that
Plaintiff's "history, physical examination, and testing
support the presence of a chronic pain disorder, possibly
fibromyalgia." Id., Claim File at 137. While Dr. Jares
concluded that "from a neurological standpoint" and
Plaintiff "retains the ability to work full-time in a

13

sedentary occupation," he conceded that his conclusion was without consideration of "[t]he diagnoses of fibromyalgia and chronic fatigue syndrome and [its] appropriate treatment," which required the expertise of a rheumatologist. Id., Claim File at 139. Dr. Jares also stated that the diagnosis of peripheral neuropathy was not substantiated "primarily for technical reasons." Dr. Jares rejected the MRI evidence of degenerative disc disease because, allegedly, "similar findings may be seen in asymptomatic individuals." Id.

In her report dated September 3, 2004, Dr. Mody concluded that the medical documentation did not substantiate a decreased level of functionality that would preclude Solomon from working at a sedentary job. Dr. Mody reported "no medical data to substantiate decreased level of functionality" and stated that "there are no doctor's notes that record any synovitis or decreased range of motion or any abnormal physical finding other than tender points." Id., Claim File at 144. She further stated that "almost everybody" meets the diagnostic criteria for fibromyalgia. Id., Claim File at 145. Dr. Mody also relied on the surveillance video report, stating that "Ms. Solomon reported that in October 2002, she could not lift,

14

could not do her grocery shopping for herself, and could
not drive herself due to fatigability and decrease level of
consciousness and ability to concentrate." Id., Claim File
at 144.

In a letter dated September 8, 2004, MetLife
upheld its decision to terminate Solomon's benefits,
stating that its determination was not based on the
presence of certain diagnoses, "but rather on current
functional limitations supported by recent objective
clinical evidence that would substantiate symptoms
consistent with those reported by the patient and medical
providers." Id., Claim File at 128. MetLife noted that
the file had been reviewed by independent specialists in
rheumatology and neurology who found that the objective
medical information did not support a functional inability
to work in a sedentary occupation.

MetLife's appeal denial letter makes no mention
of Dr. Hopkins' report or the surveillance report, reasons
which were given for the termination in MetLife's notice
dated January 14, 2004. The appeal denial letter also gave
no explanation as to why Solomon's medical evidence, which

15

had been previously accepted by MetLife as satisfactory proof of disability, was now considered insufficient.

According to Solomon, MetLife has an inherent conflict of interest in making benefit determinations because as the payer of claims, the company profits financially the fewer claims it has to pay out. According to MetLife, the profitability of MetLife's group disability insurance business depends on many factors, including, inter alia, the amount of premiums it charges its policyholders and its costs of operation. MetLife case managers and appeals specialists receive as part of their compensation package stock options in the MetLife company. MetLife employees, at least at the appeal specialist level, receive annual bonuses, which are set company-wide and differ in percentage from year to year.

According to Solomon, she is due back benefits for the period of December 2003 to the present, in the sum of $72,511.60, with appropriate interest.

In July 2004, Solomon's claim for primary SSDI benefits was approved retroactive to a period of disability commencing March 25, 2001. MetLife trains its appeals

16

specialists that they should give no weight to favorable
decisions by the SSA. According to Plaintiff, the fact
that she was found disabled by the Social Security
Administration was not considered by the Appeals Specialist
to be relevant to the appeal decision. Solomon received
SSDI benefits of $1,348/month effective October 1, 2001.

Solomon's LTD monthly benefit from September 18,
1999, through November 30, 2003, was $2,642.85, which
represented 60% of her pre-disability monthly earnings
without any offsets. According to MetLife, for the period
October 1, 2001, through November 30, 2003, an overpayment
of LTD benefits to Solomon of $29,738 was generated due to
Solomon's retroactive receipt of SSDI benefits.

Plaintiff's attorneys petitioned for and were
granted the sum of $10,125.00 for services rendered in
representing Solomon before the Social Security
Administration. This sum was deducted from Solomon's
retroactive benefits and paid directly to her attorney.
According to Solomon, MetLife should have credited her for
these fees approved by the SSA and deducted them from her
retroactive payment as compensation for attorney services

rendered in connection with the prosecution of her claim
for SSDI benefits.

In addition, Solomon claims that MetLife deducted
from her September 2003 and October 2003 checks an
estimated offset of $1,690.00 for anticipated SSDI
benefits, and that any overpayment, at most, would be
$21,543.00.

MetLife made no demand for the return of their
alleged overpayment of benefits to Solomon before
submitting its answer in this case.

## III.   Standards of Review

### a.   The Summary Judgment Standard

Summary judgment is granted only if there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. Fed. R. Civ. P.
56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986); SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329,
338 (2d Cir. 2004). The courts do not try issues of fact
on a motion for summary judgment, but, rather, determine

18

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

For the purposes of summary judgment, "[a] fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law' . . . [and an] issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of showing that there are no material facts in dispute, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and can discharge this burden by demonstrating that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. The nonmoving party then must come forward with "specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e), as to every element "essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Where, like here, the parties have cross-moved for summary judgment, "the court must

evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Bd. of Educ. of the City Sch. Dist. of the City of Olean, 667 F.2d 305, 314 (2d Cir. 1981).

In determining whether a genuine issue of material fact does exist, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). However, "the non-moving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quotation and citation omitted).

### b. The ERISA Standard of Review

Review of an administrator's denial pursuant to an ERISA benefit plan is reviewed "under a de novo standard unless the plan provides to the contrary." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where,

20

however, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the denial is reviewed for an abuse of discretion. Id.; McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 130 (2d Cir. 2008) ("Where [discretionary] authority is given, the administrator's interpretation is reviewed for an abuse of discretion."); see Suren v. Metropolitan Life Ins. Co., No. 07 Civ. 4439 (JG)(RLM), 2008 WL 4104461 at *7 (E.D.N.Y. Aug. 29, 2008) (describing "arbitrary and capricious" and "abuse of discretion" standards as "interchangeably" used in this Circuit).

There is no dispute here that the Plan grants the "Plan administrator and other Plan fiduciaries" the "discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to Plan benefits in accordance with the terms of the Plan." Calderon Aff., Exh. B, SPD at 44. The Plan further states that "[a]ny interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." Id. Nonetheless, Solomon argues that a de novo standard should

21

apply because the decision to terminate her benefits was not made in accordance with the terms of the Plan as required to trigger the administrator's discretion.

As a fiduciary, MetLife is obligated to Plan participants to follow the written terms and conditions of the Plan in reviewing disability claims. See 29 U.S.C. § 1104(a)(1)(D). Solomon contends that MetLife violated the Plan terms by not continuing to pay benefits when there was no documented improvement in her medical condition between the time MetLife accepted her medical records as satisfactory proof of disability and the time her LTD benefits were denied. In light of the Plan terms which state that once written proof of a claim "is satisfactory to us," benefits will be paid and will continue to be paid until death, completion of the maximum benefit period, or "the date that [the individual] cease[s] to be Disabled," Solomon argues that the issue of whether an abuse of discretion or de novo standard of review applies turns on whether or not Solomon "ceased to be disabled."

MetLife is also required to pay benefits only to claimants that it determines are entitled to them under the terms of the Plan. See 29 U.S.C. § 1104(a)(1)(B). The

initial approval of a claim, moreover, is not a guarantee of continuing eligibility of benefits. See Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134 (RJS), 2008 WL 169318, at *9 (citing with approval cases from outside Circuit holding that payment of benefits does not heighten proof required to terminate same); Lee v. Aetna Life and Cas. Ins. Co., No. 05 Civ. 2960 (PAC), 2007 WL 1541009, at *4 (S.D.N.Y. May 24, 2007) ("[The administrator] is not required to disprove the possibility that [plaintiff] was disabled in order to terminate her benefits; rather, it is [plaintiff's] burden to demonstrate her disability under the Plan."); see also Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006) (describing plaintiff's burden of proving total disability).

The record here shows that Solomon's condition and the basis for her disability claim did not remain static during the four years that she received LTD benefits. Solomon's initial diagnosis was lumbar radiculopathy and fibromyalgia. After an independent examining orthopedist found no objective medical basis for disability, MetLife terminated Solomon's LTD benefits in July 2000. Based in part on the report of independent rheumatologist Dr. Lieberman, who concluded that while

23

Solomon's fibromyalgia was not disabling, Plaintiff may suffer from neurological problems that would prevent her from working, MetLife reinstated Solomon's benefits. Then in 2004, after her benefits had again been terminated, Solomon submitted medical reports which included the diagnosis of CFS. Throughout this period, new evidence was also developed, including surveillance, MRI and EMGs records, the initial denial of Solomon's claim for SSDI benefits, and the evaluations of three independent physician consultants ("IPCs"). As Solomon's diagnoses changed, MetLife did not violate the terms of the Plan by requiring updated information and re-evaluating her entitlement to benefits.

In addition, none of the cases cited by Plaintiff support the application of de novo review on these facts. See, e.g., Connors v. Conn. Gen. Life Ins. Co., 272 F.3d 127, 134–35 (2d Cir. 2001) (finding "no dispute" regarding the application of a de novo standard of review because the Plan did not grant discretion to the administrator); Post v. Hartford Ins. Co., 501 F.3d 154 (3d Cir. 2007) (applying heightened arbitrary and capricious standard prior to Supreme Court's opinion in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008)). Accordingly, MetLife's

denial of Solomon's LTD benefits will be reviewed under an arbitrary and capricious standard.

## IV.  MetLife's Denial Was Arbitrary and Capricious

### a.    MetLife's Conflict of Interest Weighs Heavily Against Its Termination Decision

Solomon contends that if a deferential standard of review is applied, the Court must heavily weigh MetLife's conflict of interest against its denial of benefits.  It is undisputed that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."  Firestone Tire & Rubber Co., 489 U.S. at 115 (internal quotations and alteration omitted). In Glenn, the Supreme Court recognized that, "[o]ften the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket."  Glenn, 128 S. Ct. at 2346.   Accordingly, the Court held:

> this dual role creates a conflict of
> interest; that a reviewing court should
> consider that conflict as a factor in
> determining whether the plan
> administrator has abused its discretion
> in denying benefits; and that the
> significance of the factor will depend
> upon the circumstances of the
> particular case.

Id.

In analyzing the importance of such conflict, the
Court provided guidance as to how much weight the conflict
factor should be given within the arbitrary and capricious
framework.  The Court stated that the conflict "should
prove more important (perhaps of great importance) where
circumstances suggest a higher likelihood that it affected
the benefits decision," and "should prove less important
(perhaps to the vanishing point) where the administrator
has taken active steps to reduce potential bias and to
promote accuracy . . ."  Id. at 2351.  As an example, the
Court explained that MetLife's policy of encouraging the
plaintiff to apply for Social Security benefits, which
offset plan benefits, and then disregarding the
government's finding of disability, properly gave more
weight to the conflict in the arbitrary and capricious
analysis.  Id. at 2352.

26

In this case, MetLife was both responsible for
determining Solomon's claim and for paying any benefits
due. The record contains no evidence that MetLife
separated its financial interests from the claim
determination process. There were, however, notations in
Solomon's case file as to the reserve amount set on the
claim, first at $100,000, with the notation that Plaintiff
should apply for Social Security, and then later reset
after the initial Social Security denial, to $275,000. In
addition, as in Glenn, MetLife urged Plaintiff to apply for
government benefits, but then disregarded the SSA's grant
of benefits. Indeed the appeals specialist assigned to
decide Solomon's appeal stated that she had been trained by
MetLife to disregard SSA decisions, and that the decision
was only relevant if MetLife was paying benefits and could
use it for an offset.

Based on the foregoing, MetLife's conflict is a
significant factor weighing against its denial that must be
considered in the Court's arbitrary and capricious
analysis.

**b. MetLife's Denial Was Not Supported
by Substantial Evidence**

27

An administrator's determination is arbitrary and capricious "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (quotation and citation omitted). "'Substantial evidence' is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance.'" Armstrong v. Liberty Mut. Life Assurance Co. of Boston, 273 F. Supp. 2d 395, 404 (S.D.N.Y. 2003) (citing Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir.1995)) (alteration in original). In addition, where the Plan administrators "impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir. 1995) (alteration in original).

In its January 14, 2004 letter terminating Solomon's benefits, MetLife explained that its decision was

based on the report of Dr. Hopkins, the surveillance

reports, and a lack of supporting medical information.

Solomon questions the reliability of Dr. Hopkins' report in

light of the fact that she was employed on a regular basis

by MetLife to review disability claims. Although MetLife

describes Dr. Hopkins as an "independent reviewing

physician," she derived 99% of her income in the years

2002-2004 from paper medical reviews for third parties, 58%

to 63%, or over $100,000, of which was derived from reviews

for MetLife. To the extent Dr. Hopkins relied on MetLife

for over half of her income, she was not "independent" at

the time she reviewed Solomon's file. In addition, with

respect to MetLife's surveillance of Solomon in November

2002, the probative value of the surveillance tape is

questionable given that MetLife failed to take any action

to terminate benefits based on the tape until more than a

year later when it was relied upon by Dr. Hopkins in her

report.

Several courts have found evidence like that

relied upon by MetLife to be less than substantial. For

example, in Soron v. Liberty Life Assurance Co. of Boston,

No. 5:02 Civ. 1514, 2005 WL 1173076 (N.D.N.Y. May 2, 2005),

the district court found the decision denying benefits to a

29

plaintiff who suffered from fibromyalgia unsupported by
substantial evidence despite the insurer's reliance on the
opinions of three reviewing doctors and a surveillance tape
showing activity by the claimant. In other cases, courts
have rejected surveillance tapes similar to the tape relied
on here given their recording of daily activities unrelated
to work. See, e.g., Winter v. Hartford Life & Accident
Ins. Co., 309 F. Supp. 2d 409, 415 (E.D.N.Y. 2004)
(refusing to allow similar tapes, standing alone, to
constitute substantial evidence to support the denial of
LTD benefits in a back and neck injury case); Chan v.
Hartford Life Ins. Co., No. 02 Civ. 2943 (LMM), 2004 WL
2002988, at *9 (S.D.N.Y. Sept. 8, 2004) (rejecting video of
plaintiff walking, riding in a car, and shuffling papers as
evidence of plaintiff's ability to work).

In denying Plaintiff's appeal of its initial
termination, MetLife relied on the case file reviews of two
"independent" physicians. Dr. Jares, the reviewing
neurologist, reported that Solomon had no disabling
neurological conditions, but that the "history, physical
examination, and testing support the presence of a chronic
pain disorder, possibly fibromyalgia." Calderon Aff., Exh.
A, Claim File at 137. Dr. Mody, a rheumatologist,

submitted a brief report which relies in part on the surveillance video report from 2002. Dr. Mody found "no medical data to support a decreased level of functionality," and stated that although Solomon has fibromyalgia, "almost everybody" can meet the diagnostic criteria for the illness. Id., Claim File at 145. Neither physician examined Solomon in person.

To the extent Drs. Hopkins and Mody based their findings on the view that fibromyalgia is not generally disabling, their conclusions do not constitute substantial evidence. The Court of Appeals for the Seventh Circuit specifically discredited such a general statement as evidence of disability in individual cases. See Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) (describing "the fact that the majority of individuals suffering from fibromyalgia can work" as "the weakest possible evidence that [the claimant] can"). Relying on such statements as substantial evidence of non-disability is particularly troubling in the context of a diagnosis of fibromyalgia, "a disease that eludes [objective] measurement." Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (recognizing fibromyalgia as potentially disabling in SSDI context); see Rudzinski v.

31

Metropolitan Life Ins. Co., No. 05 C 0474, 2007 WL 2746630
(N.D. Ill. Sept. 14, 2007) ("MetLife's insistence that
Plaintiff provide documentation that she cannot possibly
produce demonstrates both a fundamental misunderstanding of
the disease and the unreasonableness of its
determination.").

The final justification for MetLife's denial
recounted in both its initial January 2004 letter and its
letter denying Solomon's appeal dated September 8, 2004, is
a lack of supporting "objective" medical information.
According to Solomon, this justification is erroneous
because the Plan contains no requirement of "objective
medical documentation," because fibromyalgia cannot be
easily proved through objective evidence, and because she
provided MetLife sufficient "objective" evidence on which
it could have based a finding of disability.

Although several courts in this District have
rejected the argument that it is prima facie unreasonable
for an administrator to base its denial on a lack of
objective medical evidence of total disability where the
Plan does not explicitly require such proof, such a
requirement may in fact be unreasonable in the context of a

32

particular case. See e.g., Maniatty v. Unum Provident
Corp., 218 F. Supp. 2d 500, 504—05 (S.D.N.Y. 2002) ("While
plaintiff argues that the plan itself does not state that
objective evidence is necessary to establish disability,
the plan does state that 'proof' of continued disability
must be provided, and the very concept of proof connotes
objectivity." (internal citation omitted)); Fitzpatrick,
2008 WL 169318, at *10 (listing cases where courts found
objective medical evidence requirement not unreasonable).
In light of Solomon's fibromyalgia and CFS diagnoses,
symptoms of which have been described as "entirely
subjective," Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir.
1995), and the 34 medical updates she provided MetLife,
including numerous clinical examinations, laboratory
reports, and various test results, Solomon furnished
sufficient proof to establish total disability under the
Plan.   In upholding its decision to terminate on these
grounds, this Court agrees with Solomon that MetLife abused
its discretion, particularly in view of its conflict of
interest, discussed above.

### c.    **Solomon Was Denied A Full And Fair Review**

33

MetLife's denial was also arbitrary and

capricious in that it denied Solomon the opportunity for a

full and fair review as required by section 1133 of ERISA.

ERISA explicitly requires employee benefit plans to "afford

a reasonable opportunity to any participant whose claim for

benefits has been denied for a full and fair review by the

appropriate named fiduciary of the decision denying the

claim." 29 U.S.C. § 1133(2). The Department of Labor (the

"DOL") has promulgated regulations that set forth the

particular procedures administrators must undertake in

order to comply with this provision. See Black & Decker

Disability Plan v. Nord, 538 U.S. 822, 825 (2003) ("ERISA

and the Secretary of Labor's regulations under the Act

require 'full and fair' assessment of claims and clear

communication to the claimant of the 'specific reasons' for

benefit denials."). These regulations state that in order

to comply with ERISA's mandate of a full and fair review,

plans providing disability benefits must:

> Provide claimants the opportunity to provide
> written comments, documents, records, and other
> information relating to the claim for benefits .
> . . [and] provide for a review that takes into
> account all comments, documents, records, and
> other information submitted by the claimant
> relating to the claim, without regard to whether
> such information was submitted or considered in
> the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(ii),(iv).

34

A fair review necessarily requires an opportunity to review and rebut the basis of the denial determination. See Crocco v. Xerox Corp., 137 F.3d 105, 108 (2d Cir. 1998) (affirming district court's judgment, based on Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813, 715 F.2d 853 (3d Cir. 1983), that "full and fair review" was not provided); Grossmuller, 715 F.2d at 857-58 (stating that full and fair review requires that claimant be presented with all relevant evidence and be afforded an opportunity to respond to that evidence); see also, Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 974 (9th Cir. 2006) (finding that "an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA" and that such a "procedural violation must be weighed by the district court in deciding whether [administrator] abused its discretion"). But see, Midgett v. Wash. Group Int'l Long Term Disability Term, 561 F.3d 887, 895 (8th Cir. 2009) (holding that "the full and fair review to which a claimant is entitled under 29 U.S.C. § 1133(2) does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers

solicited on that same level of appeal"); Metzger v. Unum Life Ins. Co. of Am., 476 F.3d 1161, 1166 (10th Cir. 2007) ("Permitting a claimant to receive and rebut medical opinion reports generated in the course of an administrative appeal . . . would set up an unnecessary cycle of submission, review, resubmission, and re-review."). Courts in this District have found that the requirement for a full and fair review continues beyond the initial determination into the appeal. See Cohen v. Metropolitan Life Ins. Co., 485 F. Supp. 2d 339, 353 (S.D.N.Y. 2007) (finding that "MetLife's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious" because although "MetLife provided [claimant] and her attorney with copies of the administrative record as developed on the initial claim . . . [its] failure to provide notice to Plaintiff of its consideration of materials in addition to those disclosed following its initial denial clearly deprived Plaintiff of the opportunity to submit comments and materials relevant to MetLife's determination"); see also Anderson v. Sotheby's Inc., No. 04 Civ. 8180 (SAS), 2006 WL 1722576, at *18–19 (S.D.N.Y. June 22, 2006) (citing Grossmuller in support of full and fair review requirement); Cejaj v. Bldg. Serv. 32B-J Health Fund, No.

02 Civ. 6141 (RMB)(MHD), 2004 WL 414834, at *8—9 (S.D.N.Y.
Mar. 5, 2004) (same).

In its letter denying Solomon's appeal, MetLife
specifically relied on the reports of Drs. Jares and Mody,
reports that were not made available to Solomon until after
the final decision was made. As a result, Solomon was not
given the opportunity to respond to the statements made in
those reviews that lead MetLife to the conclusion that she
had failed to submit sufficient "objective clinical
evidence to substantiate" her diagnoses. Accordingly,
MetLife failed to comply with ERISA's "full and fair review
mandate," further rendering its determination arbitrary and
capricious. See Cohen, 485 F. Supp. 2d at 353.

"Because district courts are required to limit
their review to the administrative record, it follows that,
if upon review a district court concludes that the
[administrator's] decision was arbitrary and capricious, it
must remand to the [administrator] with instructions to
consider additional evidence unless no new evidence could
produce a reasonable conclusion permitting denial of the
claim or remand would otherwise be a 'useless formality.'"
Miller, 72 F.3d at 1071. Although Defendants argue the

Court should remand the claim back to MetLife for
reconsideration, on the existing administrative record,
which includes substantial evidence of Solomon's multiple
disabling conditions and the fact that her conditions do
not lend themselves to objective testing, as well as
evidence of a conflict inherent in MetLife's decision-
making process, it would indeed be a useless formality to
remand the case back to MetLife.

## V. Factual Issues Preclude Summary Judgment on MetLife's Counterclaim

MetLife has counterclaimed for reimbursement for
the alleged overpayment of LTD benefits during the period
August 2001 through November 2003. Because Solomon was
awarded retroactive SSDI benefits covering this period in
July 2004, MetLife claims that it is entitled to assert as
an offset against its own benefit liability totaling $29,
738.

ERISA empowers the plan fiduciary to obtain
appropriate equitable relief to enforce the terms of the
Plan. See 29 U.S.C. § 1132(a)(3)(B). MetLife seeks an
order imposing a constructive trust on the amount of the
benefit overpayment, or granting other equitable relief

under a theory of unjust enrichment. "The Supreme Court
has delineated what forms of equitable restitution are
available under § 502(a)(3), distinguishing permissible
forms of equitable restitution such as employment of a
constructive trust or of an equitable lien from forms of
legal restitution." Nechis v. Oxford Health Plans, Inc.,
421 F.3d 96, 103 (2d Cir. 2005) (citing Great-West Life &
Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002)).
The Court has explained that "one feature of equitable
restitution [is] that it [seeks] to impose a constructive
trust or equitable lien on particular funds or property in
the defendant's possession." Sereboff v. MidAtlantic Med.
Servs., Inc., 547 U.S. 356, 362 (2006) (internal quotations
omitted). There is, however, no strict tracing requirement
for equitable liens by agreement. Id. at 365.

    Solomon argues that to maintain its equitable
nature, MetLife's reimbursement claim must seek a
specifically identifiable and non-dissipated overpayment
fund, the specific contents of which are presumably long
gone. The Plan terms, however, require Solomon to
"promptly refund to [MetLife] an amount equal to all
overpayments." Under Sereboff, the Plan fiduciary is
entitled to relief in the form of a constructive trust on

39

the overpayment amount specifically identified in the Plan,
as distinct from Solomon's general assets. See Sereboff,
547 U.S. at 363—64; Kellner v. First Unum Life Ins. Co.,
589 F. Supp. 2d 291, 312—13 (S.D.N.Y. 2008) (recognizing
that "where the LTD plan includes an applicable offset
provision, its fiduciaries may [] recover payments to
beneficiaries that are later offset by a retroactive award
of Social Security benefits"); Unum Life Ins. Co. of Am. V.
Lynch, No. 04 Civ. 9007 (CLB), 2005 WL 266562, at *3
(S.D.N.Y. Jan. 1, 2006) (holding that fact that defendant
"may have commingled" overpayment funds with other money,
"should not limit a Court of Equity from ordering equitable
restitution" for overpaid benefits).

Solomon also contends that MetLife's counterclaim
must be dismissed because it in effect seeks to impose a
lien on Plaintiff's SSDI benefits which is not permitted
under 42 U.S.C. § 407(a). See Mote v. Aetna Life Ins. Co.,
435 F. Supp.2d 827 (N.D. Ill. 2006) (holding that 42 U.S.C.
§ 407 prevented carrier's counterclaim); Ross v. Penn.
Mfrs. Ass'n Ins. Co., No. Civ. A. 1:05-0561, 2006 WL
1390446 (S.D.W.Va. May 22, 2006). Several other courts,
however, have held that § 407(a)'s prohibition is not
triggered by claims for reimbursement of overpayment. See,

e.g., Mattox v. Life Ins. Co. of N.A., 536 F. Supp. 2d
1307, 1327 (N.D. Ga. 2008); Holmstrom v. Metropolitan Life
Ins. Co., No. 07-CV-60442009, 2009 WL 901127, at *28-29
(N.D. Ill. Mar. 31, 2009) (listing "vast majority of
courts" that "have held that when a plan contains a 'lien
by agreement' and the 'overpayment,' is caused by
subsequent social security payments, Section 407 presents
no bar to recovery"). Since MetLife's counterclaim asserts
a property interest in its own overpayment of benefits
rather than Solomon's social security benefits, § 407(a)
does not require the Court to grant summary judgment for
Solomon on Defendants' counterclaim at this time.[1]

In addition, there are disputed issues of
material facts that preclude this Court from granting
summary judgment for either party on Defendants'
counterclaim at this time. Specifically, the parties
disagree as to the amount of the claimed overpayment, the
basis for MetLife's calculations, and the offsets to which
Solomon may be entitled. Further, Solomon has asserted
equitable defenses to the counterclaim which raise disputed
issues of fact, including laches and unclean hands.

[1] The Court is cognizant, however, that § 407(a) may prevent MetLife from
imposing a lien on Solomon's current income to the extent that such
income is derived solely from her benefits.

Under these circumstances, summary judgment on
MetLife's counterclaim is inappropriate.

## Conclusion

Based on the facts and conclusions set forth
above, MetLife's motion for summary judgment is denied and
Solomon's cross-motion for summary judgment is granted in
part and denied in part.

It is so ordered.

**New York, NY**
**June /7, 2009**

**ROBERT W. SWEET**
**U.S.D.J.**

42